DUNCAN *v.* ROME STREET RAILROAD CO.

*Atkinson, J.*—Under the facts as they appear in the record, the court erred in granting a nonsuit.    *Judgment reversed.*
May 19, 1896. Argued at the last term.

Action for damages. Before Judge Milner. Floyd superior court. January term, 1895.

Duncan sued the railroad company for damages from the homicide of his thirteen year old son. The nature of his action will sufficiently appear from the report of the evidence. Defendant moved for a nonsuit upon the grounds, that the killing was an unavoidable accident; that defendant exercised all ordinary and reasonable care and diligence; that the deceased could have avoided the injury by the exercise of ordinary care; and that the evidence failed to show that plaintiff was dependent upon deceased and that the latter contributed to his father's support. The motion was sustained, and plaintiff excepted.

W. A. Bishop testified: While at Hardin's stable in Rome, early on the morning of June 28, 1893, I saw an electric car run over young Duncan. He was run over fourteen or fifteen feet up the street from the crossing that goes to Kutner's store, a regular crossing over Broad street. I saw the car as it came around the corner. It stopped at Griffin's, and Mr. Farrell got on. The car started off, and the motorman sort of turned around and was talking to Farrell, and when the car got about to the crossing he commenced to ring the bell on the car, and I saw this little boy right in front of him. I think it was not more than fourteen or fifteen feet from the point where he began to ring the bell till he hit the boy. I think the reason the motorman did not see the boy sooner was that he was not looking. He was looking sort of sidewise, sort of turned around, talking to Farrell. The car was going, I think, twelve or fifteen miles per hour. I have worked about two years for a

railway company, and judging from the way a locomotive runs, I think this car was going at the speed I have mentioned. It ran about thirty feet after striking the boy. I do not think the car came to a standstill where Farrell got on, but slacked up, and he jumped on. I suppose it is sixty or seventy feet from the stable door where I was to the car track where Farrell got on. I think Broad street is about 100 feet wide, and that the track is a little north of the center of the street. The boy was going from the opposite side of the street towards the side I was on, but when I first saw him he was going back the other way. He had dropped something. I only supposed he had come first from the other side. Did not see him do so. It looked to be about fourteen feet from the crossing to where he went on the track. I did not see him turn and go back on the track. When I first saw him he was going from south side to north side—away from me. He was only a few steps from the car. He was about the middle of track, going sort of angling across it. The car hit him a moment after I saw him. Am not positive whether he was on or just going on the track when I saw him first. The whole thing occurred in a second. The motorman was on front end, north end of car, which was a summer car, and I could see through it and see the motorman all the time, even after the car passed me. I saw him at the time accident occurred. Cannot say that he was talking to Farrell just then. He was just before. Thinking that he ought to be looking to his business instead of talking, I was watching him. If I hadn't, would have seen the boy sooner. Motorman was turned to left side talking to Farrell, and did this till he was right on the boy. The car was about on or right on crossing when bell rang. A car running fifteen miles an hour would run fourteen feet nearly as quick as thought. I heard the bell ring several times, but can't tell how many. Suppose he turned on

his brake and threw off the electricity. I have run on a train and coupled cars, but never ran engine or train.

Plaintiff testified: My son would have been fourteen years old a month from the day he was killed. His mother had been dead seven years. He was working at Kutner's, and receiving $5 a month. I got the benefit of his services. He was never sick to amount to anything. I have a pain in my back and hips a good deal of the time; was not well able to work, and his wages helped me out. I have no property, am dependent on my labor for a living, and was so when he was killed. He had a common education, could read and write and was good in mathematics, was a bright, diligent boy, very attentive to business. With his qualities, by this time he would have been worth $30 per month. I am a carpenter, and my wages are from $1.50 to $2 per day. I don't get regular wages. Some months I don't make anything, because I am not able to work. I have three living children, one twelve, one four, and one one year old. I am not able to support my family, but make out to live by working, often when I am not able. I expected this son to help me make a support. He boarded with me. I don't know whether it cost $5 per month to feed and clothe him or not. He always brought me his wages. When he needed money I would give him back some. If I needed a dollar he would bring it to me. He never spent ten cents without letting me know it. I don't know what it would take to feed and clothe a boy fourteen years old. We all ate at the same table. I had sent him to school, some to the public school and some to a private school in the country. I lived in the country five years ago, and since then in Rome. I intended doing the best I could in the way of giving him an education. I would have allowed him to take his wages and educate himself, if I could have done without his wages. Part of the time I could not have supported my family without his wages. A good deal of the time during his life I was in bed and

he had to lift my feet about. He worked for wages only one year. He worked a few months at a place, by little spells, when he was a little fellow. He made but little money then. When he was killed he was learning to be a merchant. He had been in that store about a year. I don't know whether or not I make $30 per month throughout the year. Kutner told me just before my boy was killed that he was going to raise his wages. When he began there he got $4 per month. His wages had been raised to $5 per month. They said they would keep raising his wages. He dressed decently in common ordinary clothes and wore shoes. He was a delivery boy and salesman. I don't know whether he could be maintained on less than $60 per year. His services were worth a great deal to me at home. He carried wood and water and made fires. That was outside of his daily work. His services at home were worth his board and keeping.

F. M. Allen testified: When the boy was killed I was standing in the front door of Emmons' store. I heard the car bell ringing along up the street just above the crossing in front of Kutner's store. This attracted my attention, and I saw Duncan right on the track and thought the car was going to catch him, and started out and hollered, "Stop the car." From the time I started out and hollered the car ran about a car-length before it struck the boy, and ran entirely over his body. When I hollered stop the car, the motorman looked around at me; he looked to be excited. I was excited because I saw the car was going to kill the boy. I think the car was going from seven to ten miles an hour, but never had much experience. When I first saw the boy in front of it, it was running about like it ordinarily was. When I discovered him on the track I started out and ran diagonally towards the boy, and when he was struck I had gone from the door a little way off the sidewalk. I think the motorman was trying to stop the car, but I was confident the car was going to catch the boy.

When I first discovered him he was on the track six or eight feet in front of the car, running as fast as he could go. When I first saw the car it had gotten about ten feet above the crossing. The boy was running diagonally across the track, away from the car and away from me; it looked like his intention was to jump off. He had but a little time to jump off. He was running as fast as he could go and the car was running too fast for him. He was running a little diagonally, not quite along the track. Looked like his idea was to jump off. When I first saw him he was on track. When the motorman rang his gong that attracted my attention, I don't remember how often I heard the gong.

A. D. Hardin testified: When the boy was killed I was standing on the sidewalk between my stable and Kutner's store and near the latter. I saw him going across the street from Kutner's store. He ran across the street and about that time a car was coming up, and it appeared when he got on the track the car was very close on to him, and he made a couple of jumps up the track and about that time the car struck him, knocked him down and ran over him. The car was running pretty fast, I think twelve or fifteen miles per hour. It looked to me that the motorman was standing sidewise. I don't think he was looking in front. I think the car ran between fifty and sixty feet after it struck the boy. It ran clear over him. When I saw the boy running across from Kutner's store he had some books in his hands. My recollection is that he crossed the track and went back and crossed the second time, was struck as he came back. Going from the store he crossed the track thirty or forty yards in front of the car. The car must have been thirty or forty yards from him when he crossed the second time. The last time he started across, but did not get across.—It further appeared that nearly every bone in the boy's body was broken. The mortality tables in 70 Ga. were introduced.

*J. B. F. Lumpkin, Wright & Hamilton, Henry & Wright* and *G. A. H. Harris,* for plaintiff.    *Dorsey, Brewster & Howell* and *J. Branham,* for defendant.